### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL ANTHONY PRESTON,

                Plaintiff

      v.

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant

CIVIL ACTION NO. 4:15-CV-00196

(BRANN, J.)
(MEHALCHICK, M.J.)

### <u>REPORT AND RECOMMENDATION</u>

       This is an action brought under 42 U.S.C. §§405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security's ("Commissioner's") decision denying Michael Anthony Preston's ("Plaintiff's") claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.

       The period relevant to the Commissioner's decision is punctuated by an unusual circumstance. Just over one year after Plaintiff's alleged onset date, he began to experience "black outs" which led to the discovery of a large intracranial colloid cyst. Following this discovery Plaintiff underwent brain surgery, which resulted in a period of several months where he suffered from a great degree of physical and cognitive limitation which began and ended within the relevant period. The Commissioner's attempt to grapple with the diagnosis of Plaintiff's condition and months-long recovery was complicated by the fact that it was sandwiched between periods where Plaintiff unarguably suffered from a lesser degree of impairment. The Court is presented with the

difficult task of determining whether the Commissioner's final decision denying Plaintiff's claims is supported by substantial evidence.

For the reasons expressed herein, it is recommend that the Commissioner's decision be **VACATED** and that this matter be **REMANDED** to the Commissioner to conduct a new administrative hearing.

## I.   BACKGROUND & PROCEDURAL HISTORY

Plaintiff is a fifty-three year old man with at least a high school education. (Doc. 13-2 p. 32; Admin Tr. 31). Plaintiff was forty-six years old on his alleged onset date of March 1, 2009. *Id.* Plaintiff testified that he also completed a vocational course while in high school and attempted to pursue an online college degree when he was in his forties, but did not understand the logistics of completing online college coursework. (Doc. 13-2 pp. 43-44; Admin Tr. 42-43). On the date of his hearing Plaintiff lived alone, as he reported he had for the past ten years. (Doc. 13-2 p. 44; Admin Tr. 43). However, his medical records reflect that he briefly resided with his brother and sister-in-law while he was recovering from brain surgery in early 2013.

Plaintiff had a long tenure working at a paper plant, first by running a cutting machine and later in shipping. He began working at the plant in 1984, and stayed on until it closed in 2008. (Doc. 13-2 p. 45; Admin Tr. 44). After the plant closed Plaintiff unsuccessfully attempted to find work in all of the surrounding areas; he stopped looking for work sometime before December 2011. (Doc. 13-2 p. 46, 61-62; Admin Tr. 45, 60-61). Plaintiff testified that, when he worked in shipping he operated a forklift, was on his feet "all the time," and was required to lift and carry items weighing between fifteen and twenty pounds. (Doc. 13-2 p. 62; Admin Tr. 61). In a work function report completed in August 2011, Plaintiff reported that the same job required him to walk up to six hours per day, stand one hour per day, sit one hour per day,

climb one hour per day, stoop four hours per day, kneel one hour per day, crouch one hour per day, handle four hours per day, reach six hours per day, and write or handle small objects one hour per day. (Doc. 13-6 p. 14; Admin Tr. 188). He reported that he was required to lift and carry boxes of greeting cards, gift tags, and floor displays on a daily basis, and identified that these boxes weighed between fifty and twenty-five pounds. *Id.*

On July 26, 2011, Plaintiff protectively filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. In both applications Plaintiff alleged a disability onset of March 1, 2009. When ALJ Koennecke made inquiries about why Plaintiff had chosen that date, Plaintiff replied that he thought that was the date his back pain began. In his applications, Plaintiff alleged that the conditions of chronic back pain, arthritis, blackouts, high blood pressure, and seasonal allergies limited his ability to work. (Doc. 13-6 p. 6; Admin Tr. 178).

In May 2010 Plaintiff blacked out while watching television. (Doc. 13-2 p. 47; Admin Tr. 46). Initially, his primary medical care provider, certified physician's assistant Jon Vogler ("PA-C Vogler") believed that Plaintiff's black out was a symptom of high blood pressure. Plaintiff was diagnosed with vasovagal syncope. Plaintiff had a second black out on August 18, 2011. (Doc. 13-2 p. 48; Admin Tr. 47). Thereafter, PA-C Vogler ordered a brain MRI which revealed a very large intracranial colloid cyst that was causing significant hydrocephalus. (Doc. 13-13 p. 35; Admin Tr. 526). Plaintiff was referred to neurologist Atom Sarkar ("Dr. Sarkar"). (Doc. 13-13 p. 70; Admin Tr. 561). On examination Dr. Sarkar noted that Plaintiff had "moderate cognitive issues" that impaired concrete thinking and precluded nuanced conversation. *Id.* Dr. Sarkar opined that Plaintiff needed urgent operative intervention and

recommended that brain surgery be performed within the next twenty-four hours. *Id.* Dr. Sarkar later agreed to wait until after the Christmas holiday per Plaintiff's request. *Id.*

On December 28, 2011, Plaintiff underwent a surgical procedure to remove his intracranial cyst. (Doc. 13-11 pp. 37-39; Admin Tr. 431-33). Plaintiff was transferred to the ICU following surgery because he experienced two post-operative grand mal seizures, exhibited a decrease in concentration and attention based on his verbal responses, and exhibited a slowing of his fine motor movement. (Doc. 13-11 p. 44, 51; Admin Tr. 438, 445).

A post-operative speech-language pathology cognitive communication assessment dated December 29, 2011, revealed impairment in the following areas: impaired short-term memory; impaired recall beyond sixty seconds; impaired problem solving, planning, and decision-making skills; impaired math and money management skills; and impaired executive functions. (Doc. 13-11 pp. 21-24; Admin Tr. 415-18). It was also assessed that Plaintiff could not maintain attention for more than thirty seconds, exhibited decreased ability to maintain eye contact, and that Plaintiff was very distracted and required constant redirection during the assessment. *Id.* A post-operative physical therapy assessment dated December 29, 2011, revealed that Plaintiff's ability to stand (dynamic and static) was "poor," his ability to sit (dynamic) was "poor," and his ability to sit (static) was "fair." (Doc. 13-11 pp. 26-29; Admin Tr. 420-23). One day after surgery, Plaintiff could ambulate fifty feet with the use of a hand-held assistive device. *Id.* Plaintiff was instructed not to sit up or stand without supervision and demonstrated a decrease in balance and endurance due to his overall medical status. *Id.* It was recommended that Plaintiff undergo inpatient rehabilitation following surgery based on his decreased balance and endurance, decreased concentration and attention, and his difficulty following verbal cues. (Doc. 13-11 p. 28; Admin Tr. 422).

Between December 30, 2011 and January 26, 2012, Plaintiff participated in inpatient rehabilitation. (Doc. 13-13 pp. 37-39; Admin Tr. 528-30). Approximately one week prior to discharge, Plaintiff's progress with his psychologist had plateaued with moderate memory impairments still present. (Doc. 13-13 p. 38; Admin Tr. 529). He exhibited "blank stare" episodes and decreased responsiveness during rehabilitation, but these symptoms had not recurred in the week and a half before he was discharged. *Id.* On discharge, Plaintiff was instructed that he was not allowed to drive. *Id.* Plaintiff was able to walk three hundred feet without an assistive device, but still experienced occasional loss of balance. *Id.* Plaintiff was considered to be "modified independent" with his activities of daily living. *Id.* He was taken in by his brother, and was set up with home care, speech therapy, and occupational therapy. *Id.*

Plaintiff asserts that he had impaired memory and concentration following surgery. He reported that he is absolutely certain that he had no memory deficits until after he lost his job in 2008. (Doc. 13-2 pp. 51-52; Admin Tr. 50-51). Dr. Sarkar observed that, while the initial cognitive difficulties experienced by Plaintiff immediately after surgery were likely the result of the procedure, (Doc. 13-9 p. 21; Admin Tr. 338), those that remained in January 2013 were the result of a pre-existing cognitive impairment and were not related to the cyst or surgery. (Doc. 13-13 p. 59; Admin Tr. 550). Further, PA-C Vogler noted that "when [Plaintiff] complains about his memory, he is referring to the time immediate and following the surgery, for the first 4 to 6 weeks." (Doc. 13-13 p. 12; Admin Tr. 503). On February 20, 2012, May 22, 2012, and September 25, 2012, PA-C Vogler noted that Plaintiff's memory was "intact." (Doc. 13-13 pp. 8-14; Admin Tr. 499-505).

In addition to his intracranial colloid cyst, Plaintiff also testified that he had bronchial asthma that does not cause shortness of breath on a daily basis; no inhaler has been prescribed.

Plaintiff has been diagnosed with high blood pressure, but exhibits no symptoms when his blood pressure is under control. (Doc. 13-2 p. 52; Admin Tr. 51). In June 2011, Plaintiff experienced one episode of left arm numbness, but reported that this symptom has not recurred. (Doc. 13-2 p. 54; Admin Tr. 53). In July 2011, Plaintiff experienced an episode of swelling in his legs due to high blood pressure. (Doc. 13-2 pp. 54-55; Admin Tr. 53-54). He reported that he has not experienced any other episodes of swelling in his legs. *Id.* Plaintiff reported "some" pain in his neck and back that limited his ability to split wood for his fireplace. (Doc. 13-2 pp. 53-54; Admin Tr. 52-53). He reported that he has not split wood since the onset of his neurologic symptoms because "a chainsaw and fainting don't mix." *Id.* For this reason, he began to heat his home with coal, instead of wood, in 2010. (Doc. 13-7 p. 51; Admin Tr. 272). His medical records reflect that he is obese, but he reported that no doctor has ever encouraged him to lose weight.

In a function report completed in October 2011, Plaintiff reported that he could not work like he used to, could not walk as far as he could before, could not stand in one place for a long time, and described two episodes where he experienced "black outs." (Doc. 13-6 pp. 19-26; Admin Tr. 193-200). He noted that his conditions affected his ability to lift, squat, bend, stand reach, walk, sit, climb stairs, remember, complete tasks, and use his hands. *Id.* He reported that he wasn't sure how far he could walk before needing a rest, could only pay attention for a little while, could not handle stress well, could not handle changes well, and noted that he had altered his activities because he was afraid that he was going to "pass out and get hurt." *Id.* Despite his fears, Plaintiff admitted that he was able to maintain his own personal hygiene, care for his cat, cook daily meals, mow his lawn with a riding mower, go shopping for food in stores, and could follow written or spoken instructions "just fine." *Id.* During his administrative

hearing – which took place approximately a year and a half after he completed his function report – Plaintiff testified that he was still able to cook his own meals and take care of his cat. (Doc 13-2 p. 58; Admin Tr. 57). He admitted that he still did his own grocery shopping, but relied on his father for transportation at first because he was not permitted to drive for medical reasons, then later because he did not have access to a vehicle. (Doc. 13-2 p. 61; Admin Tr. 60).

On November 2, 2011, Plaintiff's claims were denied initially by the Social Security Administration. Thereafter, Plaintiff requested the opportunity to state his case before an Administrative Law Judge ("ALJ"). On February 23, 2013, Plaintiff, with the assistance of counsel, appeared and testified during an administrative hearing held by video. Plaintiff appeared in Elmira, New York, while ALJ Elizabeth W. Koennecke presided from Syracuse, New York. No vocational expert was called to testify.

On April 11, 2013, ALJ Koennecke denied Plaintiff's claims in a written decision. Plaintiff requested that the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council") review ALJ Koennecke's unfavorable decision. Plaintiff's request was denied on November 28, 2014.

After fully exhausting the available administrative remedies, Plaintiff initiated this matter by filing a complaint in this Court on January 27, 2015. (Doc. 1). In his complaint, Plaintiff requests "a judgment for such relief as may be proper." (Doc. 1 ¶2). On April 16, 2015, the Commissioner filed her answer, in which she asserts that her final decision denying Plaintiff's claims was made in accordance with the controlling laws and regulations, and is supported by substantial evidence. (Doc. 12). Together with her answer, the Commissioner filed a complete copy of the administrative record. (Doc. 13).

This matter has been fully briefed by the parties and is now ripe for resolution. (Doc. 14, Doc. 15, Doc. 16).

## II.   STANDARD OF REVIEW

When reviewing the Commissioner's final decision denying a Social Security claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g)(incorporated by 42 U.S.C. §1383(c)(3)); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's

errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5)); 20 C.F.R. §§404.1512, 416.912; *Mason*, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

## III. THE ALJ'S DECISION

In her April 11, 2013, decision denying Plaintiff's claims, ALJ Koennecke determined that Plaintiff last met the insured status requirement of Title II of the Social Security Act through December 31, 2013. (Doc. 13-2 p. 23; Admin Tr. 22). Then, after proceeding through each step of the five-step sequential evaluation process, ALJ Koennecke concluded that Plaintiff was not under a disability as it is defined by the Social Security Act at any point between his alleged onset date of March 1, 2009, and the date of her written decision, April 11, 2013. (Doc. 13-2 p. 34; Admin Tr. 33).

At step one, ALJ Koennecke found that Plaintiff had not engaged in substantial gainful activity between March 1, 2009, and April 11, 2013. (Doc. 13-2 p. 23; Admin Tr. 22). At step two, ALJ Koennecke found that the medical evidence of record supported the existence of the medically determinable severe impairment of "syncope followed by removal of an intracranial colloid cyst." *Id.* ALJ Koennecke noted that the other impairments alleged by Plaintiff in his applications for benefits were either non-severe or not medically determinable but did not provide any clear indication of which were non-severe and which were not medically determinable. (Doc. 13-2 pp. 23-26; Admin Tr. 22-25). At step three, ALJ Koennecke found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 13-2 pp. 26-27; Admin Tr. 25-26).

Prior to step four, ALJ Koennecke made a finding of fact as to Plaintiff's RFC based on the evidence of record, including Plaintiff's hearing testimony, objective medical records, and the opinions of the medical sources of record. ALJ Koennecke's RFC assessment in this case is unusually complex. She found that, during the entire relevant period from March 1, 2009, through April 11, 2013, Plaintiff had the RFC to engage in a full range of work at all exertional levels and could: "constantly understand, carry out, and remember simple instructions; to constantly respond appropriately to supervision, co-workers, and usual work situations; and to constantly deal with changes in a routine work setting." (Doc. 13-2 p. 27; Admin Tr. 26). Between May 2010 and December 2012, ALJ Koennecke found that Plaintiff was subject to the following additional environmental limitations: "avoid heights, dangerous machinery, and other hazards." *Id.*

In making these findings, ALJ Koennecke considered Plaintiff's testimony pursuant to 20 C.F.R. §§404.1529, 416.929, and Social Security Ruling ("SSR") 96-7p, 1996 WL 374186. ALJ

Koennecke noted that Plaintiff's credibility was enhanced by the fact that he demonstrated slow response time and some obvious memory deficits at the hearing, but was diminished by the following facts: he appeared to choose his alleged onset date at random; he continued to look for work until shortly before December 2011; he applied for and passed the physical exam to obtain a commercial driver's license ("CDL") on October 20, 2010; and he admitted in August 2011 that he was still able to work and that he was able to cut firewood. (Doc. 13-2 pp. 29-30; Admin Tr. 28-29). Ultimately, ALJ Koennecke found that Plaintiff's testimony about the intensity, severity, and limiting effects of his impairments were only partially credible. (Doc. 13-2 p. 29; Admin Tr. 28).

On February 28, 2011, treating non-acceptable medical source, PA-C Vogler completed a health-sustaining medication assessment form for the Pennsylvania Department of Public Welfare. (Doc. 13-7 p. 17; Admin Tr. 238). On this form PA-C Vogler noted that Plaintiff had a need for the health sustaining medication of Zestoretic/Atenolol for hypertension. *Id.* PA-C Vogler opined that Plaintiff could work while taking this medication. *Id.* ALJ Koennecke accorded "some" weight to PA-C Vogler's assessment because although PA-C Vogler is not an acceptable medical source under the regulations, his evaluation was supported by his own treatment notes and reports. (Doc. 13-2 p. 28; Admin Tr. 27).

On October 21, 2011, Plaintiff was examined by nontreating source R. Craig Nielsen, M.D. ("Dr. Nielsen"), who completed a narrative examination report, medical source statement addressing Plaintiff's ability to performed physical work-related activities, and range of motion chart. (Doc. 13-7 pp. 49-59; Admin Tr. 270-80). It is important to note, Dr. Nielsen's examination predates the detection of Plaintiff's intracranial colloid cyst, but did occur after Plaintiff began to experience "blackouts." *Id.* On physical examination, Dr. Nielsen found that Plaintiff showed good memory and concentration and could readily recall a word given to him ten minutes earlier. *Id.* Plaintiff's back

was straight, was not tender, and there was no evidence of costo-vertebral angle ("CVA") pain. *Id.* There was 1+ (barely detectable) edema bilaterally, Plaintiff's deep tendon reflexes ("DTRs") were normal, straight leg raise testing was negative in both sitting and supine positions, there was no atrophy of the extremities, and Plaintiff's gait and station were normal. *Id.* Plaintiff carried a straight and simple walking stick, but did not use it to ambulate. *Id.* He heel and toe walked well, was able to rise from a squat without difficulty, and was able to get in and out of a chair and on and off the exam table without difficulty. *Id.* Plaintiff was able to sit, bend, walk, lift, and grasp normally. His fine and dexterous movements were normal, except that he could not quite oppose his thumb to either fifth finger. *Id.*

Dr. Nielsen diagnosed Plaintiff with low back pain (arthritic), hypertension (treated), history of syncope (syncopal episodes x2 over the past year, etiology to be determined), obesity, and history of allergies. *Id.* Dr. Nielsen opined that Plaintiff had no limitation to his ability to lift or carry objects, no limitation to his ability to stand or walk for prolonged periods, no limitation to his ability to sit for prolonged periods, no limitation to his ability to push or pull with his upper or lower extremities, and no postural or environmental limitations. *Id.* ALJ Koennecke accorded "significant" weight to Dr. Nielsen's opinions, but noted that she incorporated some environmental limitations into Plaintiff's RFC from 2010 through 2012 due to Plaintiff's history of syncope. (Doc. 13-2 p. 28; Admin Tr. 27).

On April 3, 2012, Plaintiff was examined by treating neurologist Atom Sarkar, M.D. ("Dr. Sarkar") three months after his intracranial colloid cyst was removed. (Doc. 13-10 pp. 5-6; Admin Tr. 360-61). During his examination, Dr. Sarkar observed that Plaintiff's immediate recall was intact, his ability to spell the word "world" forward was intact, and his ability to complete serial sevens was intact. *Id.* Plaintiff was not, however, able to spell the word "world" backwards, and his

ability to retain three items after five minutes was reduced – he could recall only one item out of three. *Id.* Dr. Sarkar recommended that Plaintiff taper off Dilantin (anti-seizure medication), and released Plaintiff from any restrictions except for the recommendation that Plaintiff should not drive. *Id.* Dr. Sarkar anticipated that Plaintiff would be able to drive again in approximately three months. *Id.*

On January 8, 2013, Plaintiff returned to Dr. Sarkar for another follow-up appointment. (Doc. 13-10 pp. 35-36; Admin Tr. 390-91). During this examination Dr. Sarkar noted that Plaintiff's ability to spell was "somewhat hampered" but opined that was due to a pre-existing mild cognitive impairment. *Id.* Plaintiff was able to do serial sevens, was able to recall three items immediately, but was not able to recall three items after five minutes. Dr. Sarkar opined that it was unlikely that Plaintiff's cyst would recur and recommended that Plaintiff should follow up in one year. *Id.*

ALJ Koennecke accorded "substantial" weight to the opinions expressed in Dr. Sarkar's April 2012 and January 2013 treatment notes because they were supported by Plaintiff's treatment records. (Doc. 13-2 p. 28; Admin Tr. 27).

The complexity of ALJ Koennecke's RFC assessment is echoed in her findings at steps four and five of the sequential evaluation process. ALJ Koennecke found that from March 1, 2009, through April 2010, and again from January 2013 through April 11, 2013, Plaintiff could engage in his past relevant work as a shipping/order picker as Plaintiff actually performed it. (Doc. 13-2 p. 30-31; Admin Tr. 29-30). This determination was based on Plaintiff's hearing testimony that his past relevant work required him to be on his feet "most of the time," and lift between fifteen and twenty pounds. *Id.* The ALJ reasoned that Plaintiff's job as he described it was not precluded by the RFC assessment that Plaintiff could engage in work at all exertional levels, and retained "the ability, on a sustained basis, to constantly understand, carry out, and remember simple instructions; to constantly

respond appropriately to supervision, co-workers, and usual work situations; and to constantly deal with changes in a routine work setting." *Id.*

ALJ Koennecke found that Plaintiff could not engage in his past relevant work from May 2010, the approximate date his neurological symptoms began, and December 2012, the approximate date that Plaintiff was considered to have recovered fully from his surgery, because his past relevant work was precluded by the fact that Plaintiff needed to avoid "heights, dangerous machinery, and other hazards." *Id.*

At step five, ALJ Koennecke found that from May 2010 through December 2012, Plaintiff could engage in other work that existed in significant numbers in the national economy. (Doc. 13-2 p. 32-33; Admin Tr. 31-32). She did so based on the application of medical-vocational guideline ("grid") rule 204.00[1] and SSRs 96-9p, 83-14, and 85-15, which ALJ Koennecke found to establish

---

[1] Grid rule 204.00 of 20 C.F.R. Part 404, Subpart P, Appendix 2 provides that:

> Maximum sustained work capability limited to heavy work (or very heavy work) as a result of severe medically determinable impairment(s). The residual functional capacity to perform heavy work or very heavy work includes the functional capability for work at the lesser functional levels as well, and represents substantial work capability for jobs in the national economy at all skill and physical demand levels. Individuals who retain the functional capacity to perform heavy work (or very heavy work) ordinarily will not have a severe impairment or will be able to do their past work—either of which would have already provided a basis for a decision of "not disabled". Environmental restrictions ordinarily would not significantly affect the range of work existing in the national economy for individuals with the physical capability for heavy work (or very heavy work). Thus an impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and generally is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse.

that Plaintiff's various nonexertional limitations had only a minimal impact on Plaintiff's occupational base under the grids. *Id.*

## IV.   ANALYSIS

Plaintiff contends that ALJ Koennecke's RFC assessment that he could engage in work at all exertional levels, but "should avoid exposure to heights, dangerous machinery and other hazards," and "retains the ability, on a sustained basis, to constantly understand, carry out, and remember simple instructions; to constantly respond appropriately to supervision, co-workers, and usual work situations; and to constantly deal with changes in a routines work setting," is not supported by substantial evidence. (Doc. 14 pp. 4-8). He asserts that, there is medical evidence supporting the presence of nonexertional limitations that were not addressed by ALJ Koennecke, and that ALJ Koennecke's failure to explain why these limitations were not credited is an error requiring remand. *Id.*

Plaintiff asserts that ALJ Koennecke ignored several symptoms that were noted on December 29, 2012 – while Plaintiff was recovering in the ICU following brain surgery. These symptoms include: moderate cognitive impairment, decreased attention to task, decreased ability to make eye contact, significant distractibility, an expressive language limitation resulting in mild to moderate delay in response time, moderate to severely impaired short term memory for recent and novel information, moderate to severely impaired delayed recall for three unrelated words after one minute, and, poor safety awareness. *Id.*; *see also* (Doc. 13-11 p. 22; Admin Tr. 416). The Commissioner asserts that these findings "have little or no value in terms of assessing Plaintiff's overall ability to function throughout the entirety of the relevant period." (Doc. 15 p. 17-18). The Court agrees with the Commissioner that most of these findings have little relevance to the ALJ's ultimate conclusion. In order to be found disabled under the Social

Security Act, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). There is no evidence that the symptoms and limitations of decreased attention to task, inability to maintain eye contact, impaired short term memory, delayed recall, or poor safety awareness persisted for twelve months or more. Because these limitations did not persist, they are not relevant to the ultimate issue of disability in this case. The same cannot be said, however, for the moderate cognitive impairment and the expressive language impairment.

ALJ Koennecke did not recognize any cognitive impairment (severe, non-severe, or non-medically determinable) at step two, and in the section of her decision in which she explains her RFC assessment observed that "[t]he medical evidence of record shows that the claimant had no functional limitations from the date of his alleged disability onset … until the date he experienced his first syncopal episode." (Doc. 13-2 p. 27; Admin Tr. 26). However, ALJ Koennecke accorded "significant" weight to Dr. Sarkar's treatment notes, which reflect that Plaintiff had "moderate cognitive limitations" or a "mild cognitive impairment" that was unrelated to his intracranial cyst or its removal. In fact, ALJ Koennecke appeared to credit this assessment by limiting Plaintiff to unskilled work for the entire relevant period – which sharply contrasts with the above-quoted language. Furthermore, ALJ Koennecke noted that Plaintiff's credibility was enhanced by the fact that he demonstrated a "slow response time" to questions during the administrative hearing; an observation that is reminiscent of the expressive language impairment observed after Plaintiff's surgery. (Doc. 13-2 p. 29; Admin Tr. 28). The lack of consistent findings as to whether Plaintiff suffered from a "cognitive impairment" or expressive language disorder, and if so, whether these

impairments resulted in additional functional limitations, causes us to question the accuracy and completeness of ALJ Koennecke's RFC assessment. This in turn undermines her conclusions at steps four and five of the sequential evaluation process. On remand the ALJ should resolve the issue as to whether such an impairment exists, and if it does further develop this issue in the record as he or she deems appropriate.

Next, Plaintiff asserts that ALJ Koennecke ignores the nonexertional limitations identified by nonexamining state agency medical consultant Louis B. Bonita, M.D., ("Dr. Bonita"). The record reflects that on October 31, 2011, Dr. Bonita completed a physical residual functional capacity assessment in connection with the adjudication of Plaintiff's claims at the initial level of review. *See* SSR 96-5p, 1996 WL 374183 at *6 ("Medical and psychological consultants in the State agencies are adjudicators at the initial and reconsideration levels … As such, they do not express opinions; they make findings of fact that become part of the determination."). Dr. Bonita's assessment predates the discovery of Plaintiff's intracranial cyst and brain surgery but post-dates the emergence of his symptoms. Dr. Bonita opined that Plaintiff was capable of engaging in what amounts to "medium" work as defined in 20 C.F.R. §§404.1567(c) and 416.967(c) except that he could: never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, crawl, and climb ramps or stairs. Dr. Bonita also opined that Plaintiff should avoid concentrated exposure to hazards. (Doc. 13-3 pp. 5-8; Admin Tr. 67-70). Dr. Bonita's findings, while not indicative of disability, are more favorable to Plaintiff's claim than the other medical opinions relied on by ALJ Koennecke.

Plaintiff aptly notes that such opinions must be considered as nonexamining medical source opinions at the administrative hearing level, 20 C.F.R. §§404.1527(e) and 416.927(e), and must not be ignored, SSR 96-6p, 1996 WL 374180 at *2. The Commissioner asserts that, although ALJ Koennecke did not mention Dr. Bonita's opinion, Dr. Bonita's conclusions do not undermine ALJ

Koennecke's RFC assessment because the differences between the ALJ's finding and Dr. Bonita's opinion are "superficial." She essentially argues that ALJ Koennecke's failure to address Dr. Bonita's opinion amounts to harmless error. In support of her argument, the Commissioner relies on the case of *Miller v. Colvin*, No. 3:12-cv-01813, 2014 WL 2047903 (M.D.Pa. May 19, 2014). The Court finds that *Miller* is distinguishable from this case. In *Miller*, the Court found that the ALJ committed harmless error where he analyzed the plaintiff's claims based on an alleged onset date that was approximately three month earlier than the plaintiff's amended alleged onset. *Id.* at 6-7. While the error in *Miller* – examining a longer period of time than alleged – clearly did not impact the ALJ's decision because the entire the relevant period was still considered, the Court cannot say the same for ALJ Koennecke's failure to discuss or even recognize the existence of a relevant medical opinion that is more favorable to Plaintiff's claims than the other medical opinions of record. Furthermore, in failing to address Dr. Bonita's medical opinion, ALJ Koennecke violated 20 C.F.R. §§404.1527(e) and 416.927(e) which obligates the ALJ to consider such opinions.

Moreover, even if ALJ Koennecke did consider this opinion, the Third Circuit has held that an ALJ is obligated to convey some expression of the evidence that was considered that supports his or her result, and some indication of the evidence that was rejected because in its absence "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Because ALJ Koennecke failed to indicate whether she considered this opinion, the Court cannot determine whether her decision is based on the evaluation of "every medical opinion," 20 C.F.R. §§404.1527(c) and 416.927(c), or whether her RFC assessment is based on "all the relevant evidence medical evidence," 20 C.F.R. §§404.1545(a)(3), 416.945(a)(3). On remand, the ALJ should consider and weigh Dr. Bonita's medical opinion.

Last, with respect to Plaintiff's assertion that ALJ Koennecke's findings at step five are not supported by substantial evidence because the ALJ was obligated to review additional vocational evidence beyond the Social Security Rulings, such as testimony by a VE, to support her findings, the Court finds that it need not address this issue. Any such error may be remedied on remand. The Court does recognize, however, that while it is the more favored practice in this Circuit to call upon the services of a vocational expert during an administrative hearing in a case where nonexertional limitations are present, reliance on the Social Security Rulings to support findings at steps four and five of the sequential evaluation process is not prohibited in cases involving nonexertional limitations as long as it is "crystal clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." *Breslin v. Comm'r of Soc. Sec.*, 509 F.App'x 149, 154 (3d Cir. 2013)(quoting *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005)). Nonetheless, on remand, it is recommended that the ALJ be free to further develop the vocational evidence of record as he or she deems appropriate.

## V.    RECOMMENDATION

Based on the foregoing, the Court concludes that the final decision of the Commissioner denying Michael Anthony Preston's applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act is not supported by substantial evidence, and recommends that the Commissioner's decision be **VACATED** and this case be **REMANDED** for a new administrative hearing.

Dated: January 28, 2016                                   *s/ Karoline Mehalchick*

                                                          **KAROLINE MEHALCHICK**
                                                          **United States Magistrate Judge**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

MICHAEL ANTHONY PRESTON,

             Plaintiff

    v.

COMMISSIONER OF SOCIAL
SECURITY,

             Defendant

CIVIL ACTION NO. 4:15-CV-00196

(BRANN, J.)
(MEHALCHICK, M.J.)

**NOTICE**

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **January 28, 2016**.

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**